Filed 4/28/15  P. v. Hernandez CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F067630 |
| Plaintiff and Respondent, | |
| v. | (Fresno Super. Ct. No. F08903742) |
| MARTIN VILLALOBOS HERNANDEZ, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Fresno County.  Jane Cardoza, Judge.

Marcia R. Clark, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Charity S. Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## <u>INTRODUCTION</u>

Sometime after midnight on May 8, 2006, a gunman entered James Rodriguez's (James) apartment and fired multiple shots killing James and his girlfriend, Nicole Allen (Nicole), and critically wounding James's brother, Joseph Rodriguez (Joseph).[1]  About

---

[1] Given the multiple parties with the same last names, we will refer to certain people by their first names for ease of reference; no disrespect is intended.

one week later, the family of appellant/defendant Martin Villalobos Hernandez spoke to the police and revealed that defendant admitted he shot the victims, based on his erroneous belief that the victims were responsible for the disappearance of his mother's Chihuahua dog. Defendant disappeared for two years. In 2008, he was arrested in Mexico and brought back to Fresno County for trial.

After a jury trial, defendant was convicted as charged of counts I and II, the first degree murders of James and Nicole (Pen. Code,[2] § 187, subd. (a)); count III, attempted premeditated murder of Joseph (§§ 664, subd. (a)/187, subd. (a)); and count IV, assault with a firearm on Joseph (§ 245, subd. (a)(2)), with the special allegation he personally used a firearm (§ 12022.5, subd. (a)(1)).

As to counts I and II, multiple murder special circumstances were found true (§ 190.2, subd. (a)(3)). As to count I, II, and III, the jury found defendant personally and intentionally discharged a firearm causing death and great bodily injury (§ 12022.53, subd. (d)). As to counts III and IV, the jury found defendant personally inflicted great bodily injury on Joseph causing paralysis (§ 12022.7, subd. (b)).

Defendant was sentenced to an aggregate term of two life sentences without the possibility of parole for the first degree murder convictions with special circumstances; one life sentence with the possibility of parole for attempted murder; plus 75 years to life for the firearm allegations.

On appeal, defendant contends the court improperly denied his pretrial motion to introduce evidence and cross-examine law enforcement officers about the police department's alleged failure to investigate suspects other than himself. Defendant contends the court erroneously treated his motion as one to introduce evidence of third-party culpability for the murders. Defendant asserts he did not seek to introduce evidence

---

[2] All further statutory references are to the Penal Code unless otherwise indicated.

under this legal principle, and the court abused its discretion and denied his right to present a defense when it prevented him from cross-examining the officers.

As we will explain, defendant's pretrial motion clearly sought to introduce evidence that various unnamed third parties may have been responsible for the murders, the court properly addressed the motion based on the legal principles of third-party culpability, and the evidence was correctly excluded as speculative, remote, and prejudicial. We affirm.

## FACTS

As of 2006, defendant lived with his parents and his 16-year-old son, Martin Jr., in an apartment on East Amador near Fink-White Park in Fresno.[3] Defendant's mother had two Chihuahua dogs; one dog was named "Minnie." In early May 2006, defendant's parents went to Mexico to visit their family. Defendant's mother left her two Chihuahua dogs with defendant and Martin Jr.

On Sunday, May 7, 2006, defendant and Martin Jr. discovered "Minnie" had slipped under the screen door and ran away while they were working outside.

Defendant's sister, Socorro Alvarado (Socorro), found out that "Minnie" was missing and went to defendant's apartment. She was mad defendant had lost the dog. She pushed and slapped them around, and "smacked" defendant. She told them that they better get the dog back.[4]

---

[3] Martin Jr. testified he did not have a relationship with defendant. His grandparents took care of him; defendant was not around most of the time; and defendant had just recently appeared at his grandparents' apartment before the shooting.

[4] Later that night, the police were called to defendant's apartment because of the argument between defendant and Socorro, and Socorro was told to leave.

3

Martin Jr. initially rode a bicycle around the neighborhood to look for the dog.  He could not find it and went home.  Defendant joined him in the search.  They rode around the area on separate bicycles and kept looking for the dog.[5]

**The Rodriguez Family**

James Rodriguez (James) lived in an apartment on South Trinity, in the same neighborhood as defendant, but he did not know defendant or his family.  James lived with his girlfriend, Nicole Allen (Nicole); their young children; and James's sister, Lenze Rodriguez (Lenze, also known as Lindsay).

On Sunday, May 7, 2006, James's family gathered at his apartment to celebrate his birthday.  The guests included James's brother, Joseph Rodriguez (Joseph), and their father, Ruben Rodriguez (Ruben).[6]

At some point that day, Lenze and James walked to a nearby store.  They noticed a group of people in the park with a dog.  Lenze testified the dog did not seem to belong to the people.  As they left the store and walked back to their apartment, Lenze and James were stopped by a teenage Hispanic boy, later identified as Martin Jr.  Martin Jr. asked if they had seen a dog.  Lenze and James told the teenager about the dog they had seen in the park.  The teenager left and they continued to walk home.  Lenze testified that later in their walk, James thought he saw the same dog at a house near the park.  James told

---

[5] Martin Jr. and Socorro were called as prosecution witnesses.  Both witnesses claimed they did not remember details about the incident or what they previously said to investigators and gave statements which were inconsistent with their prior interviews.  The prosecution and defense agreed that the videotapes of the police interviews with Martin Jr. and Socorro could be introduced into evidence.  The majority of their statements are from these interviews.

[6] Joseph testified he used crystal methamphetamine earlier that day.

4

Lenze that he hoped to see the teenage boy again so he could tell him about the dog. James and Lenze returned to their apartment.[7]

## Defendant and Martin Jr. Visit the Rodriguez Apartment

Around 10:00 p.m., the Rodriguez family was gathered at James's apartment when two people appeared at their kitchen door. Lenze testified that one person was on a bicycle, and he was the same teenage boy who had asked them about the dog earlier in the day. A man was with the teenager, and the teenager had to translate for him. The two people were later identified as defendant and Martin Jr.

Lenze and Joseph testified that James and other family members spoke to the two people. They were looking for a lost "rare golden" Chihuahua and offered a $500 reward for it. Joseph thought that was a "ridiculous amount" for a dog. James and his family said they did not have the dog. James told the two people that they had seen a dog by a house on the other side of the park earlier in the day. Ruben (James's father) was drunk and "mouthing off" at the two people. They were there about five minutes and left.

Martin Jr. later recounted their visit to the Rodriguez apartment. Martin Jr. said he and defendant walked around an apartment complex and called the dog's name. Someone shouted at them to shut up. They heard a dog bark and thought someone hit the dog because it cried. Martin Jr. said he and defendant spoke to some people in an apartment where they heard the noises. Martin Jr. recognized the man as the same person he talked to earlier about the dog. The people in the apartment were drinking and said they did not have the dog. Defendant offered a reward of $500. The people again said they did not have the dog, and they might have seen the dog at a nearby house.

Martin Jr. said the people in the apartment were disrespectful to them. Both defendant and Martin Jr. thought they had the dog and were lying about it.

---

[7] Martin Jr. told officers that he spoke to some people by the store who told him they thought they had seen a dog in the area.

5

**Defendant and Martin Jr. Split Up**

Martin Jr. said they left the apartment and defendant was angry. He was convinced the dog was there. Defendant said "he's going to have to do something – go get the dog back." Martin Jr. said, "Don't do nothing stupid." Defendant again said he was going to get the dog back.

Martin Jr. said they went back to their home. Defendant changed his clothes and put on a gray hooded sweater, and left their apartment around midnight. Martin Jr. did not go with him.

**The Murders**

In the meantime, the Rodriguez family was still gathered at James's apartment. Sometime after midnight on Monday, May 8, 2006, James, Joseph, Lenze, and Nicole were drinking, playing dominoes at the kitchen table, and listening to music. James's infant son was in his carrier in the kitchen. Ruben, their father, was passed out on the living room couch.

Joseph testified a man suddenly appeared and walked in the kitchen door. He did not say anything. Joseph thought the man knew James because he acted so casual. Joseph testified the man was wearing multiple layers of clothes which made him look big: A light gray sweater or sweatshirt, a "hoody," a jean jacket, jeans, and tennis shoes. Lenze noticed the man's hooded grey sweatshirt.

Joseph testified the man was "just standing there, smiling, kind of moving with the music, and then puts [both] his hands up like raising the roof." Joseph exchanged confused looks with James, Nicole, and Lenze, as if to ask, "Who is this guy?" Lenze testified the man said, " 'Yeah' " and held his hands, palms up, toward the ceiling in the "raise the roof" gesture. She was frightened and did not know who he was.

6

Joseph briefly turned away from the man and then looked at him again.  Joseph testified the man suddenly pointed a revolver at him and started firing.  Joseph was shot in the right shoulder and fell to the floor.

Joseph testified that as he fell down, Nicole stood up and started screaming.  The man kept firing his gun.  Nicole was shot and fell on top of Joseph.  The man walked around the kitchen.  Lenze fell to the floor and acted like she was dead so the man would not shoot her.  Joseph and Lenze testified the gun was silver with a black handle.

Joseph testified he tried to help Nicole.  Joseph looked back at the gunman, and the gunman looked at Joseph "with a confused look on his face, as if, you know, wait a minute.  I wasn't supposed to be awake or I shouldn't have been moving.  And then he pointed the gun at me again."

Joseph testified the gunman was about to shoot him again, but James pushed the kitchen table on top of Joseph to protect him.  Joseph believed James saved his life by pushing the table toward him.  Joseph and Lenze took cover under it.

Joseph testified the gunman appeared to walk out of the kitchen door.  James rushed after him and tried to close the door behind him.  However, the gunman "was waiting for James" and tried to get back into the kitchen.  The gunman was holding the gun in his left hand.  James pinned the gunman's left arm between the door and the frame, and his body was outside the door.

Joseph and Lenze testified James struggled with the gunman and tried to close the door.  The gunman kept waving his arm around and fired more shots.  Joseph thought these shots were "random" because the gunman's vision was blocked by the kitchen door.  As the shots were fired, James stumbled backwards and appeared to be wounded.  Joseph testified the gunman walked through the door, stood in front of James, and fired another shot into James's chest.  James fell to the floor.

7

Joseph testified that after James fell down, the gunman "[l]ooked at James, looked over in my direction, looked at Nicole, smiled, and walked out." Joseph testified the gunman "looked like he couldn't care less about what had just happened" as he left.

**The Casualties**

After the gunman left, Lenze called her boyfriend, Ryan Nale, who had been on his way to their apartment. She was hysterical, screaming, and crying, and said someone had shot Joseph and Nicole, and she thought James was dead. Nale told her to call 911, which she did.[8]

The paramedics and police responded to the Rodriguez apartment. Nicole was pronounced dead at the scene. Nicole had been shot once in the left side of her back. The cause of death was perforation of the heart and left lung from the gunshot wound. She would have died within a couple of minutes. The pathologist recovered the bullet from her body.

James was still alive when the paramedics arrived, but he died at the hospital. James suffered two gunshot wounds, which were fired into the front of his body. The pathologist determined James's cause of death was perforation of the aorta, liver, and intestines from multiple gunshot wounds. There was black soot and stippling on his clothing and the chest entrance wound, consistent with the gun being discharged within three feet of his body.[9]

Joseph was taken to the hospital in critical condition. He had one gunshot wound to his right shoulder. The bullet ricocheted into his spine and lodged between two

---

[8] Lenze later told Nale that a man wearing a black "hoody" walked in; he was laughing; and he pulled out a gun and just started shooting.

[9] James and Nicole's infant son, who had been sitting in his carrier at the kitchen table, was not wounded. Their young children were taken into protective custody by Child Protective Services after their parents were murdered.

8

vertebrae, and remained in his spine. He suffered permanent paralysis in his legs and was left in a wheelchair.

## After the Shooting

Martin Jr. stated that about 10 minutes after defendant left their apartment, defendant returned home with "Minnie" the dog.[10] Defendant told Martin Jr. to hurry and open the door. Defendant said he got the dog "from the same place." Martin Jr. asked how he got the dog. Defendant said it was his business and not to worry about anything. Martin Jr. went to bed.

Martin Jr. said the next morning, defendant told him that he went to get the dog back and "he shot some guys. Don't tell nobody." Defendant said he was going to run away because he did something wrong, and he was afraid "the Nortenos" and the "cops" might catch him. Defendant said "gangsters" were looking for Martin Jr. Defendant took Martin Jr. to a friend's house. Defendant told Martin Jr. that his friends would take care of him. Defendant drove away in his truck. Martin Jr. believed Socorro picked up the dogs.

Victor Rosas was the friend with whom defendant left Martin Jr. Defendant talked to Rosas earlier on Sunday, and said his mother's dog was missing. On Monday, May 8, 2006, defendant called Rosas and asked him to take care of Martin Jr. When Rosas picked up Martin Jr., the teenager said defendant told him that he had killed two people.[11] Rosas did not believe what Martin Jr. told him.

---

[10] Martin Jr.'s statements are from his May 13, 2006, interview with the police, which was introduced as his prior inconsistent statements given his refusal to answer questions when he appeared at trial.

[11] Victor Rosas was called as a prosecution witness and testified he could not remember what he told the police and gave statements inconsistent with his prior interview with officers. Rosas's videotaped interview with the police about his conversations with defendant and Martin Jr. were introduced as prior inconsistent statements.

9

Later on Monday night, defendant arrived at Rosas's house. Defendant said he was going to leave town. Rosas asked defendant about his motives and why he killed two people. Defendant said they were looking for the little dog on Sunday, and "they" told his son the dog was somewhere in the house. Rosas asked defendant who said this. Defendant said "the people who tried to kidnap" his son, and they told his son to go to a certain house. Defendant said he did not shoot anyone, but he got into a fight.

Rosas said he later spoke to defendant on the telephone, and defendant said he killed somebody. According to Rosas, defendant said: "[Y]eah man. You know, I killed, you know, two, maybe three people, and I don't [*sic*] know there was going to be a female there. I had no idea there's going to be a female. I thought it was all guys." Defendant told Rosas, "I never thought I would kill a woman. I thought they were all men in the house. I never thought … I would kill a woman." Defendant continued: "… I never knew there was a female. I swear to God. There was a female there. I never would have done it. I just wanted to kill those mother f**kers." Defendant said it happened near where he lived. Defendant told Rosas that he shot himself in the foot "when shooting somebody and somehow a gun went off and hit him." Rosas did not notice defendant walking with a limp when he saw him on Monday. Defendant told Rosas he was going to Sacramento and that he was not running from the police, but from "people that were trying to kill him."

Rosas later took Martin Jr. to stay with Socorro. Socorro did not want the teenager to stay with her because she was afraid. Socorro told Martin Jr. that defendant scared her and said to take care of him. Martin Jr. said defendant briefly returned and said he had been shot in the leg.

**The Initial Investigation**

When the police investigated the crime scene, they recovered expended Remington .38-caliber special casings and one live Remington round from the

10

Rodriguez's kitchen. They also discovered drops on the walkway, porch area, and door of the apartment, which tested positive for blood. The blood samples did not reveal the presence of DNA.

The officers interviewed the surviving victims about the shooting. Lenze said an older man and a boy on a bicycle came to the apartment, and they were looking for a dog. Lenze said they had talked to the same boy at the park earlier that day. When the police spoke to Joseph at the hospital, he also mentioned the people who had been looking for a dog. Joseph said he had never seen the gunman before and did not recognize him. Joseph was not certain, but he did not believe the gunman was the same man who had been to the apartment earlier to ask about the missing dog.

Joseph was shown several photographic lineups. He pointed to features of various individuals who looked similar to the gunman, but he never selected a single photograph or identified anyone as the suspect. Lenze also reviewed photographic lineups, and pointed to pictures of two subjects who looked similar to the gunman, based on the subjects' dark eyes and hair. She did not positively identify anyone.

The police tried to locate the people who were looking for the dog as potential witnesses. They spoke to several neighbors by the park, who confirmed that a boy had been looking for a dog, but they could not find him.

**The Statements from Socorro and Martin Jr.**

The police did not have any suspects or breaks in the multiple homicide case until a week later. At 11:56 p.m. on May 12, 2006, Socorro called the police department and reported she had information about a shooting, and she was receiving threatening telephone calls.

The police responded to her residence, where they met with Socorro and Martin Jr. Socorro was nervous and agitated. Socorro said she had been receiving death threats from the family of the victims that defendant hurt. Socorro said she was estranged from

11

defendant, and she did not want him around her family because he abused drugs. Socorro said defendant had left town, and she did not know where he was.

An officer separately spoke to Martin Jr., who was very quiet. Martin Jr. said that defendant had told him he shot some people over a missing dog. He said that when defendant came home that morning, he brought the dog back with him. Martin Jr. saw the news story that some people were shot near his home. Martin Jr. said defendant took him to a friend's house after the shooting. He thought defendant might have gone to Mexico, but he was not sure. Martin Jr. was taken to the police department for a lengthier interview.[12]

After Martin Jr. left the residence, Socorro seemed calm and relieved. She told the officers that she spoke to defendant on the telephone on the same day as the shootings. Defendant told her to watch the news and said, "[I]t was me." Socorro said she saw the news reports about the shootings and thought the gunman's description matched defendant. She also thought the shootings were about her mother's dog.

Socorro said defendant arrived at her home the morning after the shootings. Defendant threatened Socorro and said it would be better for her not to say anything to the police, or Socorro and her kids would be "screwed." Socorro believed defendant made some of the anonymous telephone threats to her.[13]

Socorro said she had received a telephone call from an unknown person who said they were "safeguarding" Martin Jr. from people associated with the victims.

_____

[12] As noted above, Martin Jr.'s videotaped interview with police officers was introduced into evidence as his prior inconsistent statements, and has been referred to throughout the factual statement herein.

[13] At trial, Socorro denied that she thought defendant made the threatening telephone calls or that she told the police he was responsible for them. Socorro testified that she called the detectives and told them to change her statement to indicate that defendant did not make the threatening calls.

The police spoke to Socorro's husband later that day. He said that defendant had called and threatened Socorro.

The police checked the caller identification log on Socorro's telephone, which indicated a call was received from "Merchado Farms" on May 8, 2006; a call was received from Victor Rosas on May 12, 2006, and a call was received from Sacramento, also on May 12, 2006. The officers also spoke to Victor Rosas, who revealed his conversations with defendant and Martin Jr. Rosas said defendant may have gone to Sacramento.

## Further Investigation

The police executed a search warrant at the East Amador apartment where defendant and Martin Jr. lived. The police found two live .38-caliber special Remington rounds in a bedroom dresser.

There were droplets on the front door, which tested positive for blood. The DNA from the blood came from an unidentified male.

The officers found two gray hoody sweatshirts that did not contain any blood; a pair of jeans with bloodstains that contained defendant's DNA; and a pair of white athletic shoes with bloodstains that did not contain any detectible DNA.

A criminalist testified the spent rounds found in the victims' apartment, and recovered from the bodies of James and Nicole, were consistent with .38-caliber special bullets, and could have been fired from several different types of revolvers.

## Arrest of Defendant

On June 6, 2008, two years after the murders, defendant was taken into custody in San Diego after being arrested in Tijuana by the Mexican police. Detective Byrd examined defendant's left leg to determine if he had shot himself. Defendant had a scar on the front and back of his left leg that appeared consistent with a gunshot wound. An X-ray did not reveal any bullet fragments.

13

**DEFENSE EVIDENCE**

Defendant did not testify. The defense called Officer Joshua Panatages, who interviewed Lenze about the gunman. Lenze said he was a Hispanic male, 30 to 40 years old, about five feet six or eight inches tall, and weighed 140 to 175 pounds. Lenze said he was wearing a gray hoody sweatshirt and dark jeans. Lenze thought she could identify the gunman if she saw him again, but Lenze did not identify defendant or anyone else as the gunman.

Officer Jesse Navarro testified Joseph described the gunman as a Hispanic male, 35 years old, five feet six inches tall, and wearing a gray hoody. Joseph believed he could identify the gunman if he saw him again. However, Joseph never identified defendant or anyone else as the gunman.

Officer Mark Yee executed a search warrant at defendant's apartment. He found the white sneakers with traces of blood, and two .38-caliber bullets. The murder weapon was never found. Yee testified the search warrant described defendant as five feet seven to 10 inches tall, weighing 180 to 200 pounds, and born in either 1969 or 1970. Yee also found a citation which had been issued to defendant, and described him as five feet 11 inches tall, weighing 200 pounds.

Cynthia Desoto-Cooper, the police department's crime scene technician, testified there were presumed blood droplets leading from the Rodriguez's kitchen door, out to the sidewalk and to the street.

**DISCUSSION**

## I. The Court Properly Excluded Defendant's Proposed Evidence on Third Party Culpability

Defendant raises one issue on appeal. He contends the court abused its discretion when it denied his pretrial motion to introduce evidence about the alleged gang affiliation of James; the speculation by Joseph's father than his lifestyle was the reason for the

14

carnage; and the purported violent relationships that both James and Nicole previously had with their respective girlfriends and boyfriends. Defendant argues the court erroneously treated his offer of proof as a motion to introduce evidence of potential third-party culpability. Defendant contends his attorney did not intend to introduce this evidence as relevant to the potential third-party culpability of unknown people. Instead, he asserts the evidence was relevant to challenge the adequacy of the police investigation and show that the police settled on defendant as the suspect without checking other leads, to support the defense theory that defendant was not the gunman.

As we will explain, defendant's pretrial motion was clearly based on third-party culpability, and the court did not abuse its discretion when it excluded defendant's proffered evidence because of its highly speculative nature under the doctrine of third-party culpability.

### A. Third-Party Culpability

We begin with the well-settled legal principles. "An accused may defend against criminal charges by showing that a third person, not the defendant, committed the crime charged…." (*People v. Mackey* (2015) 233 Cal.App.4th 32, 110; *People v. Hall* (1986) 41 Cal.3d 826, 832 (*Hall*).) "[A]ny relevant evidence that raises a reasonable doubt as to a defendant's guilt, including evidence tending to show that a party other than the defendant committed the offense charged[,]" is admissible. (*Hall*, *supra*, at p. 829.)

"To be admissible, the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that *any* evidence, however remote, must be admitted to show a third party's possible culpability. [E]vidence of *mere motive or opportunity* to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be *direct or circumstantial evidence* linking the third person to the actual perpetration of the

15

crime." (*Hall*, *supra*, 41 Cal.3d at p. 833, italics added; accord, *People v. Lucas* (2014) 60 Cal.4th 153, 280–281 (*Lucas*); *People v. Elliot* (2012) 53 Cal.4th 535, 580; *People v. Robinson* (2005) 37 Cal.4th 592, 625; *People v. Abilez* (2007) 41 Cal.4th 472, 517.)

In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1325; *Hall*, *supra*, 41 Cal.3d at p. 834.) We shall not disturb the trial court's ruling absence an abuse of discretion. (*People v. Robinson*, *supra*, 37 Cal.4th at p. 625.)

## B. **Pretrial motions**

The preliminary issue on appeal is whether defendant's pretrial motion was based on the doctrine of third-party culpability or some other legal theory. We thus turn to the pretrial proceedings.

The prosecution filed a pretrial motion to exclude any potential defense evidence of possible third-party culpability for the murders. The prosecution believed the defense intended to introduce photographs taken during the autopsy of James, which purportedly showed gang-related tattoos, together with testimony from a defense gang expert that James was a member of the Bulldog gang; that the Bulldogs were rivals of the Norteño gang; the two gangs committed violent crimes against each other; and other people might have been responsible for the murders. The prosecution argued such evidence was irrelevant and remote, and there was no offer of proof to support the defense allegations of third-party culpability.

In response, the defense filed a motion to call defense expert Mike Fitzgerald to testify about James's possible gang involvement, because his body was "riddled with gang tattoos," and the jury should be aware of this evidence "in light of the defense's theory that someone, other than [defendant] is the culprit."

16

Defendant moved to introduce evidence found in the Rodriguez apartment that allegedly showed James was a member of the Bulldog gang. The motion also sought to introduce statements by Ruben (the father of James, Joseph, and Lenze), who allegedly told investigators that Joseph might have done something to cause the shootings because he was into drugs and stole money from unnamed people. Defendant also wanted to introduce evidence that Nicole's former boyfriend had been violent toward her, and James had problems with his former girlfriend.

In making these offers of proof, defense counsel asserted she was not going to introduce evidence of "third-party culpability," but instead that the "defense theory is only that [defendant] did not commit these crimes. *There were numerous individuals with motives to kill*." (Italics added.)

The prosecution filed opposition and cited *Hall's* standard that evidence of third-party culpability was only admissible if there was direct or circumstantial evidence linking a third person to the crime; motive or opportunity was not enough. The prosecution asserted the defense offer of proof merely relied on speculative theories about James's alleged gang connections, and the personal lives of Joseph and Nicole, and failed to present any evidence that someone else was at the victims' residence and shot them.

## C. Hearing on Defendant's Motion

At the hearing on defendant's motion, the court noted the above-quoted standard from *Hall* as to the admissibility of third-party culpability evidence. Defense counsel replied that in drafting the motion, she "toyed" with the idea of whether "it's actually third-party culpability, because … I don't know who did it. All I know is it wasn't my client. So I'm not saying it was the gangsters."

Defense counsel argued there were "many others" who had motives and expressed their intent to harm the victims. Defense counsel noted the police investigation focused

17

on gangs until defendant's sister called the police and implicated him. Counsel complained that at that point, the police stopped investigating other leads and other possible suspects.

In support of the motion, defense counsel moved to introduce larger versions of the prosecution's autopsy photographs of James's body, which showed close-ups of his tattoos: "Gangsta," a drawing of a bulldog holding a gun, "Bulldog for life," "True Dogg," "Killa Valley" over a drawing of the state of California; and a bulldog paw. Defense counsel also cited police reports and photographs showing gang-related paraphernalia in the victims' apartment, and that officers thought it was significant that James was a Bulldog gang member.

Defense counsel wanted the defense expert to testify about the significance of James's gang tattoos and the gang paraphernalia in the victims' apartment. Counsel argued the evidence was relevant because defendant was not a gang member, he did not commit the charged offenses, and the shootings were committed "in a fashion that's foreign to my client, which is gangs, local Bulldog gangs." The victims lived in an area with high gang activity, and gang members used the nearby park as a gathering place.

Defense counsel also cited the statement from Ruben, the victims' father, who told the police that James was a Bulldog gang member who was trying to get out; and Joseph was somehow responsible for the shootings because Joseph had just been released from jail, he had stolen money, he was into drugs, and "suddenly the place is shot up."

The court believed defendant's offer of proof was simply based on motive. Defense counsel replied she was "not saying it's motive," and the defense expert would not testify that the shootings were "a gang hit," but he would explain the significance of the gang-related evidence. Counsel wanted to challenge whether the police conducted a thorough investigation, and address their failure to investigate the former violent

18

relationships of James and Nicole. Counsel complained the police investigation into possible suspects ended once defendant's sister called them.

The prosecutor objected to the defense's photographic close-ups of James's tattoos. Defense counsel pointed out that the close-ups were from the prosecution's photographs of the autopsy, and one of the bullet holes was through a letter in the "Gangsta" tattoo, and that tattoo could not be ignored.

The prosecutor argued defendant wanted to claim someone else committed the crimes, but defendant's proposed evidence was vague, speculative, irrelevant, and failed to connect any specific third party to the shootings.

The court asked defense counsel that since she wanted to "present evidence regarding that someone else did it, isn't that third-party culpability?" Counsel again said she "toyed" with that concept and there was some "confusion" since the defense theory was that defendant did not commit the crimes and it had to be someone else. "I'm not saying one specific person. I'm not saying it was Nortenos. I'm not saying it was exes. I don't know who that was. … I'm not arguing third-party culpability because I'm not pointing the finger to any particular person or group."

### D. **The Court's Ruling**

The court denied defendant's motion to introduce evidence about James's gang tattoos and membership, the close-up photographs of James's tattoos, Ruben's statements about James and Joseph, the defense expert's proposed testimony, and allegations about the former relationships of James and Nicole. The court found the defendant sought to introduce this evidence to suggest that someone else was the gunman, which implicated the principles of third-party culpability.

The court reviewed the relevant legal principles from *Hall*, that evidence of mere motive or opportunity to commit the crime without more was not sufficient, that there must be direct or circumstantial evidence linking a third person to the actual perpetration

19

of the crime. The court also reviewed a series of cases that addressed the admissibility of third-party culpability.

> "In the present case, the most defense counsel is prepared to establish is that James … might possibly have been a Bulldog gang member, that James had Bulldog gang-related tattoos, that in 2006 the Bulldogs and the Nortenos did not get along, and that they lived in the same … general area where the victim resided; that James' ex-girlfriend and Nicole's ex-boyfriend possibly had a motive for being angry and violent with the murder victims; and that Joseph's issues with others may possibly very well have been the motive for the shooting.

> "But such evidence does not and does nothing to link anyone to the actual perpetration of the crime as required by the California Supreme Court in the case of *Hall*. Thus, this Court, in the exercise of its discretion, finds that the slight probative value, if any, of this defense evidence is substantially outweighed by the possibility of jury confusion and undue delay."

The court noted the defense failed to provide any time frame about these allegations, particularly Ruben's statements about James's gang involvement and Joseph's drug use. The court also noted that while the prosecution's autopsy photographs showed James's fatal wounds and some of his tattoos, the defense versions were more prejudicial than probative because they were close-ups of the tattoos and did not serve any other purpose.

> "Moreover, there's no allegation that this shooting was gang-related. There's no evidence establishing – that's been provided to the Court that this was a gang shooting. There's no evidence that defendant is a gang member. At most, this type of evidence would cause the jury to speculate that the victim, James, was a[n] active gang member; had bad character; and that the other victim, Nicole …, was also of bad character because she was James' girlfriend. This evidence is inflammatory, speculative, and would confuse and mislead the jury."

### E. Defendant's Appellate Arguments

On appeal, defendant contends the superior court "erroneously and persistently" addressed and "mischaracterized" his pretrial motion as one to introduce evidence of

20

potential third-party culpability.  Defendant argues the court erroneously relied on *Hall's* discussion of third-party culpability to prevent his attorney from cross-examining the investigating officers about James's gang membership and their failure to investigate other leads, including the prior violent relationships which James and Nicole had with different people.  Defense counsel "asked for nothing more than the latitude to cross examine the police on the nature, scope and quality of the investigation."  Defendant argues the court's refusal to permit defense counsel to explore these issues with the investigating detectives violated his constitutional rights to present a defense and confront and cross-examine witnesses.

Defendant asserts his attorney made it clear "her purpose was to test the quality of the investigation and not to mount a third-party culpability defense," and "that the defense position was that the killer was unknown and that she intended to cross examine the detectives about the course of their investigation, the shifting focus of that investigation and 'the way that witnesses were questioned.'  Not to point the finger of suspicion at any particular party."

> "While it is true counsel also stated she wanted to cross examine the detective about a local gang, her purpose in doing so was part of the overall plan to explore the entire investigation and the thoroughness with which it was conducted…."

Defendant further asserts his pretrial motion only proposed to have his attorney "cross examine the detective about the victim's gang tattoos and the local gang, but [counsel] expressly stated that [it] was *not* for the purpose of having him opine that this was a gang killing.  [Citation.]  Rather, counsel's intent was to challenge the effectiveness of the investigation conducted before the focus of suspicion fell on [defendant]."  (Italics in original.)  Defense counsel "reiterated that it was the quality of the investigation she wanted to target – not a specific individual, or even gang .…"

Counsel "considered," but "disavowed," that she was arguing third-party culpability because she was not "pointing the finger to any particular person or group."

### F. Analysis

The entirety of defendant's appellate argument is that the court erroneously believed his pretrial motion was to introduce evidence of third-party culpability, and the denial of the motion violated his constitutional right to present a defense. However, defendant's characterization of his own motion is contrary to the actual pleadings and the arguments raised before the superior court.

As set forth above, defense counsel realized that her offers of proof failed to satisfy *Hall's* standard for third-party culpability evidence and admitted she "toyed" with that theory, but insisted her proposed evidence was admissible to show that various unnamed persons had motives to murder the victims. While counsel tried to skirt the motion's inherent deficiencies and call it something other than third-party culpability, her arguments squarely fit within that legal doctrine since counsel admitted that she wanted to show there were "many others" who had motives and expressed their intent to harm the victims.

Defendant's appellate arguments also ignore the specific nature of the evidence he moved to introduce: Close-up autopsy photographs of James's body to show his alleged gang tattoos; alleged gang paraphernalia found in the victim's apartment; and Ruben's statements about James's gang membership. Counsel moved to introduce the testimony of a defense gang expert who would rely on this evidence and opine that James was a member of the Bulldog gang; the victims lived in an area with high gang activity; the nearby park was a gathering place for gang members; and the shootings were committed "in a fashion that's foreign to my client, which is gangs, local Bulldog gangs." In the same context, counsel wanted to introduce Ruben's belief that Joseph was somehow responsible for the shootings because of his recent release from jail, his drug use, and his

22

alleged theft of money from unknown parties. Counsel also moved to introduce evidence about the alleged violent personal relationships that James and Nicole had with other people.

Based on the nature of the motion, the offers of proof, and the parties' arguments, the superior court did not erroneously mischaracterize defendant's motion as one to introduce evidence of third-party culpability. Defendant's pretrial motion did not seek to cross-examine the detectives on the thoroughness of their investigation. Instead, defendant moved to call a defense expert on gangs, and introduce evidence that James was a member of the Bulldogs, raise the suspicion that the shootings were gang-related; and raise separate suspicions based on Ruben's belief that Joseph had an enemy who may have been responsible, and people who previously had personal relationships of James and Nicole may have had the motive and intent to harm them. The entirety of defendant's offer of proof lacked any specificity, time lines, or even clarity as to the unknown gunman's motives to commit murder.

Defendant's offer of proof squarely fit within *Hall's* discussion of inadmissible third-party culpability evidence. While an accused may defend against criminal charges by showing that a third person, not the defendant, committed the crime charged, "evidence of *mere motive or opportunity* to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be *direct or circumstantial evidence* linking the third person to the actual perpetration of the crime." (*Hall*, *supra*, 41 Cal.3d at pp. 832, 833, italics added.)

In that light, we find the court did not abuse its discretion when it denied defendant's pretrial motion because of the speculative nature of defendant's proffered evidence of alleged third-party culpability. Indeed, the proposed introduction of more specific evidence has been held as too remote and prejudicial under *Hall*. For example, in *Lucas*, *supra*, 60 Cal.4th 153, the defendant was charged with murder. He moved to

23

question the victim's father about her former boyfriend and crank-calls she received before she disappeared. The defense motion was based on an offer of proof that the victim's former boyfriend repeatedly tried to contact her; she was afraid of him; he visited her house the morning after her disappearance; he appeared nervous; he returned there later that night; he acted unusual by not looking anyone in the eye; and the victim received anonymous telephone calls from women who would laugh and hang up. The trial court decided the evidence did not make the former boyfriend a third-party suspect and was, therefore, irrelevant, misleading and confusing. (*Id*. at p. 280.)

*Lucas* held the evidence was inadmissible and prejudicial under *Hall* because "the connection between the former boyfriend and the victim's abduction and killing was speculative with no evidence, either direct or circumstantial, in support. [The victim's] alleged fear of her ex-boyfriend and his attempts to contact her were based on her statements, which are hearsay. Even assuming the offer of proof suggested that the former boyfriend had a motive to hurt [the victim], there was nothing about his conduct that tended to raise a reasonable doubt about the defendant's guilt and nothing that connected the former boyfriend to her disappearance. The defendant's offer of proof also failed to connect the harassing phone calls to any conduct by the ex-boyfriend…." (*Lucas*, *supra*, 60 Cal.4th at pp. 280–281.)

In *People v. Suff* (2014) 58 Cal.4th 1013 (*Suff*), the defendant was charged with murdering 13 prostitutes in Riverside County. The defendant moved to introduce evidence that three more prostitutes were murdered in the same county after he was arrested, to raise the inference of third-party culpability for the charged crimes. *Suff* held the trial court properly excluded the defendant's evidence. "The evidence that, after defendant was arrested, three prostitutes, at least two of whom abused drugs, were fatally stabbed and whose bodies were dumped like trash, does not establish a link between a third person and the crimes charged against defendant. None of these shared

24

characteristics is unusual or distinctive.  As the prosecutor noted, prostitutes are vulnerable and tend to be victimized.  [Citations.]  Therefore, the trial court did not abuse its discretion in excluding this evidence." (*Id*. at pp. 1063–1064.)

In *People v. Kaurish* (1990) 52 Cal.3d 648 (*Kaurish*), the defendant was charged with the sexual molestation and murder of a 12-year-old girl.  (*Id*. at p. 669.)  The trial court excluded the defendant's proposed evidence that someone named Sheffner might have committed the crimes.  Defense counsel said there was evidence that the victim and her mother stole money and a painting from Sheffner and bragged about it, that Sheffner said he would get even with them one or two weeks before the murder, and that Sheffner had a past history of child sexual molestation.  Defense counsel argued this evidence pointed to Sheffner as a possible murder suspect, and the victim's mother should be questioned about this issue.  The prosecutor replied that Sheffner's alleged vow of vengeance was made eight or more weeks before the murder, and the incident was too remote and insubstantial to link him to the murder.  (*Id*. at pp. 684–685.)

*Kaurish* held the evidence about Sheffner was properly excluded.  "The most that counsel was prepared to establish was that Sheffner had a motive for being angry with the victim's mother, and possibly with the victim.  But such evidence does nothing to link Sheffner to the actual perpetration of the crime, as required by *Hall* .…  We find that the court was within its discretion in concluding that the slight probative value, if any, of this evidence was substantially outweighed by the possibility of jury confusion and undue delay." (*Kaurish*, *supra*, 52 Cal.3d at p. 685.)  *Kaurish* also held that for the same reasons, the court properly excluded the defendant's proposed evidence about the alleged " 'seedy' character of the neighborhood where the murder occurred, when defendant offered to raise the further possibility that the murderer was some unknown derelict…." (*Id*. at p. 686.)

As applied to this case, the court did not abuse its discretion when it denied defendant's pretrial motion which clearly sought to raise the inference of third-party culpability. Defendant's offers of proof were far more specious than the third-party evidence which was held inadmissible in *Kaurish*, *Suff*, and *Lucas*. The proposed evidence of James's alleged gang membership, the close-up photographs of his tattoos, Joseph's alleged and unsubstantiated personal problems, the nature of James and Nicole's prior relationships, and the defense expert's opinions about gang activity in the area was not "capable of raising a reasonable doubt of defendant's guilt." (*Hall*, *supra*, 41 Cal.3d at p. 833.) Defendant failed to offer "direct or circumstantial evidence linking" a third person to the "actual perpetration of the crime," and merely raised the thinnest of inferences of "mere motive or opportunity to commit the crime" by unidentified subjects who might have wished harm on the victims. (*Ibid*.)

Defendant's federal constitutional argument is similarly unpersuasive. Although "[f]ew rights are more fundamental than that of an accused to present witnesses in his [or her] own defense" (*Chambers v. Mississippi* (1973) 410 U.S. 284, 302), evidence proffered to show third-party culpability may be excluded without violating the federal Constitution " 'where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial.' " (*Holmes v. South Carolina* (2006) 547 U.S. 319, 327; *People v. Prince* (2007) 40 Cal.4th 1179, 1243.)

## DISPOSITION

The judgment is affirmed.

_____

Poochigian, Acting P.J.

WE CONCUR:

26

_____
Detjen, J.


_____
Franson, J.